**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

BRYAN GALL,

        Plaintiff,

vs.

KELLY EHRISMAN and
CHAD SHOVER,

        Defendants.

No. 22-CV-26-CJW-MAR

**MEMORANDUM OPINION
AND ORDER**

_____

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................ 3

II.    RELEVANT BACKGROUND ......................................................... 3

     A.    Factual Findings ................................................................... 3

     B.    Plaintiff's Complaint and Procedural History ................................ 12

III.   APPLICABLE LAW ..................................................................... 13

     A.    Summary Judgment ............................................................. 13

     B.    Section 1983 Claims ............................................................ 15

     C.    Deliberate Indifference to a Serious Medical Need .......................... 16

IV.   ANALYSIS.................................................................................. 17

     A.    Deliberate Indifference to a Serious Medical Need .......................... 18

1.     Serious Medical Need……………………………………………………19

2.     Deliberate Indifference……………………………………………21

B.     Qualified Immunity …………………………………………………25

V.     CONCLUSION ………………………………………………………27

# I.    INTRODUCTION

This matter is before the Court on defendants' motion for summary judgment. (Doc. 63). Plaintiff filed a timely resistance. (Doc. 72). Defendants filed a timely reply (Doc. 73). For the following reasons, the Court **grants** defendants' motion.

# II.    RELEVANT BACKGROUND

## A.    *Factual Findings[1]*

Plaintiff was incarcerated in the Linn County Jail ("the Jail") from January 13, 2022, to April 11, 2022, due to a United States Marshals' hold. (Doc. 63-2, at 1). Prior to his incarceration, plaintiff had been receiving methadone treatment from the Cedar Rapids Comprehensive Treatment Center ("CRTC"). (Doc. 63-3, at 10). Before going into custody, plaintiff did not coordinate a continuation of that treatment with CRTC while he was incarcerated. (*Id.*, at 11). Upon booking in the Jail, plaintiff notified staff that he was on methadone and asked staff to contact the CRTC about continuation of his treatment. (Doc. 63-2, at 1; Doc. 63-3, at 54). Jail staff had plaintiff sign a medical release of information ("ROI") "for this medication." (Doc. 63-3, at 45, 54).

Because plaintiff was a under the U.S. Marshals control, his medical care and treatment was subject to the Detention Services Intergovernmental Agreement 29-00-0019 between the Jail and the United States Marshal Services Prisoner Operations Division (POD). (Doc. 63-3, at 6). Under that agreement, all outside medical care provided to federal detainees at the Jail must be pre-approved by the federal government and/or their third party provider except in a medical emergency. (*Id.*). At the time of

---

[1] In setting out the facts, the Court has relied upon defendants' statement of undisputed material facts, most of which plaintiff did not dispute. When plaintiff has disputed facts, the Court has separately referenced the record. The Court found defendants' statement of material facts sparse, given the record, to address all the material facts necessary to resolve the issues, so the Court has cited at length portions of the supporting evidence contained in defendants' appendix at Docs. 63-3 and 63-4.

plaintiff's incarceration in the Jail, the POD did not have a direct funding contract with CRTC—meaning that they would not and could not reimburse either CRTC or the Jail for patient care costs. (*Id.*).

CRTC and the Jail have an arrangement whereby current CRTC patients are taken from the Jail to CRTC weekly to receive a dose of methadone and are given additional doses for the Jail staff to administer. (Doc. 63-3, at 10). This requires a certified physician to submit an opioid treatment exception request to the Iowa Department of Public Health. (*Id.*). That form is necessary for methadone providers to release doses to the Jail to administer. (*Id.*).

The medical literature regarding best practices of treatment of Opioid Use Disorder (OUD) is not uniform. (Doc. 63-3, at 6). Management of mild to moderate withdrawal symptoms and treatment of pain with non-narcotics is routinely utilized by medical treatment professionals in the care and treatment of patients with OUD. (*Id.*).

Prior to his incarceration at the Jail, plaintiff also had a history of pilonidal disease. (Doc. 63-2, at 1). Pilonidal disease is an infection or small holes or tunnels in the skin at the top of the buttocks where they divide.[2] The Jail staff and outside medical staff monitored and treated plaintiff's pilonidal wound throughout his stay on a daily basis. (Doc. 63-2, at 1-2).

On Friday, January 14, 2022, the day after plaintiff was booked into the Jail, Kelly Ehrisman, Nurse Coordinator for the Jail, spoke to CRTC about plaintiff's methadone treatment. (Doc. 63-2, at 1; Doc. 63-3, at 9, 57). The CRTC told Ehrisman they did not have a provider that could sign the federal exception paperwork that would allow plaintiff to receive the methadone in jail until the following Monday and, by then, plaintiff would be off the methadone for so long that the doctor would not restart the prescription.

---

[2] *See* https//www.ncbi.nlm.nih.gov (last visited 8/15/2023).

4

(Doc. 63-3, at 57).  On the same day, plaintiff had medication dropped off by GHC for treatment of his pilonidal disease and Dr. Alshouse prescribed Vyvanse to plaintiff for that condition after a physical examination.  (Doc. 63-3, at 55).

On January 15, 2022, plaintiff was observed in possession of and attempting to conceal and/or ingest foreign substances by mouth and rectum.  (Doc. 63-2, at 2). Specifically, staff saw plaintiff reaching into the back of his pants and he pulled out a piece of paper with a white powdery substance on it.  (Doc. 63-3, at 32).  Plaintiff attempted to put it in his mouth and staff had to stop him and ultimately take him to the ground.  (*Id.*).  When staff conducted a strip search of plaintiff following this incident, a guard observed the end of a condom coming out of plaintiff's rectum.  (*Id.*).  Plaintiff attempted to reach for it and staff had to use a taser on him.  (*Id.*, at 32-33).  Staff transported plaintiff to the emergency room to have the object removed from his rectum. (*Id.*, at 33).  The object contained a green leafy substance that resembled marijuana, but because it was covered by feces the Jail staff did not attempt to test it.  (*Id.*).[3]

While at the hospital, Dr. Daniel A. Evans examined plaintiff.  (Doc. 63-2, at 2; Doc. 63-4, at 6-7).  Dr. Evans discussed with plaintiff the need to continue his prescription for his pilonidal infection, and that it was important for him to follow up with his addiction clinic to figure out his regiment of methadone.  (Doc. 63-4, at 6).  He

---

[3] Plaintiff somewhat objects to these facts to the extent that he was only willing to admit that staff reported seeing these events and that he was taken to the hospital, suggesting by omission that he denies the other details.  (Doc. 72-1, at 2).  The Court finds these facts supported by defendants' submissions, however, and plaintiff has presented no evidence to the contrary. Regardless, these facts are not directly relevant to the question of whether defendants were deliberately indifferent to plaintiff's serious medical needs.  They are, however, pertinent as background to explain the purpose of plaintiff's visit to the emergency room and to show that his alleged opioid withdrawal issues was neither the reason for, nor the focus of, his visit to the hospital.

5

was not prescribed withdrawal medication, though Dr. Evans did note in the discharge summary that plaintiff had opioid withdrawal. (*Id.*, at 6, 8; Doc. 63-3, at 56).

Plaintiff alleges in his amended complaint that "[a]s the Nursing Supervisor, Defendant Ehrisman would have received a copy of that emergency room report." (Doc. 55, at 12). But there is nothing in the record necessarily showing that. Ehrisman has not acknowledged seeing the report at the time and plaintiff has produced no evidence showing that she, in fact, saw that report. At most, it may be implied that she saw it at some time because she references it in her affidavit. (Doc. 63-3, at 12). For purposes of this order, the Court will assume Ehrisman saw the report at or shortly after it was generated.

On January 21, 2022, a Jail nurse responded to plaintiff's complaint about not receiving methadone, explaining to him that "there is no doctor for a federal exception." (Doc. 63-3, at 58). Plaintiff became argumentative and threatened suicide. (*Id.*).

On January 23, 2022, plaintiff submitted a grievance about his request to receive medication from CRTC. (Doc. 63-2, at 2; Doc. 63-3, at 23). Relying on his review of nursing logs, including Ehrisman's entry for January 19, 2022, and after speaking to Jail medical staff, Lt. Chad Shover responded to plaintiff's grievance. (Doc. 63-3, at 18). Lt. Shover told plaintiff that "the treatment center said that you have been off of your medication long enough that they will not extend your prescription. Grievance denied." (Doc. 72-1, at 3).

On January 25, 2022, Jail medical staff treated plaintiff for bleeding from his open wound to his buttock. (Doc. 63-3, at 59).

On January 26, 2022, Dr. Robert Braksiek examined plaintiff to treat plaintiff for his pilonidal wound. (Doc. 63-2, at 2; Doc. 63-3, at 42). Dr. Braksiek is the Medical Director at the Jail. (Doc. 63-3, at 5). Plaintiff's chief complaint was his pilonidal wound that predated his incarceration. (*Id.*, at 6). Dr. Braksiek worked to provide him

6

with appropriate pain relief given plaintiff's history of substance abuse and his allergies. (*Id.*). Dr. Braksiek did not observe plaintiff exhibit opioid withdrawal symptoms. (*Id.*). Plaintiff did, however, state to a nurse that he was experiencing muscle cramps and diarrhea. (Doc. 63-3, at 48). Plaintiff specifically denied that day having hallucinations or delusions and his thoughts were found to be logical. (*Id.*).

On January 27, 2022, CRTC discharged plaintiff from the clinic. (Doc. 63-2, at 2). In a letter, CRTC stated that plaintiff had last been medicated on January 13, 2022, prior to going to the Jail. (Doc. 72-1, at 3; Doc. 63-3, at 46). CRTC noted:

> It was planned for [plaintiff] to receive his medication while in jail though due to miscommunication with jail staff, [plaintiff] was not able to come to clinic to medicate. [Plaintiff] will be discharged from our clinic due to no medication for 15 days.

(*Id.*).

On January 31, 2022, Dr. Braksiek examined plaintiff and referred him to Mercy General Surgery for a consultation; an appointment was made for February 4, 2022. (Doc. 63-3, at 60).

On February 2, 2022, Dr. Safdar saw plaintiff, noted he was angry about not receiving Suboxone and that plaintiff refused other medications to treat anxiety and insomnia. (Doc. 63-3, at 49). Dr. Safdar also noted that "he is [in] U.S. Marshal [custody] and they will not approve/pay for Suboxone." (*Id.*). During this same visit, plaintiff's thoughts were found to be logical and he denied hallucinations and delusions. (*Id.*, at 50-51).

On February 3, 2022, plaintiff submitted another grievance, claiming that Ehrisman lied when she stated she spoke with CRTC and was told plaintiff was off his methadone too long that the doctor would not renew his prescription. (Doc. 63-3, at 24). Plaintiff stated that "Jenna" from CRTC, who plaintiff says was his "treatment

coordinator," denied that Ehrisman was told that and plaintiff requested he be provided methadone. (*Id.*).

On February 7, 2022, plaintiff was seen again by medical staff for treatment of his open wound. (Doc. 63-3, at 61).

On February 9, 2022, Jail medical staff again examined plaintiff. (Doc. 63-3, at 52). Again, his thoughts were found to be logical and he denied hallucinations and delusions. (*Id.*).

On February 15, 2022, plaintiff requested wound dressing supplies, but then refused to address the issue with Jail medical staff at sick call. (Doc. 63-3, at 65).

On February 16, 2022, plaintiff was seen at the Mercy hospital for the consultation about his pilonidal wound. (Doc. 63-4, at 14-21). Other than the wound, plaintiff's symptoms were unremarkable and he was negative for constitutional, respiratory, cardiovascular, gastrointestinal, genitourinary, and psychiatric/behavior symptoms. (*Id.*, at 16). On that same day, plaintiff was seen by Jail medical staff after he returned from the consultation appointment at Mercy and received further treatment for the open wound on his buttock. (Doc. 63-3, at 66). A further appointment at Mercy was scheduled for February 18, 2022. (*Id.*, at 67).

On February 17, 2022, Dr. Braksiek examined plaintiff again. (Doc. 63-2, at 2; Doc. 63-3, at 43). During this examination, Dr. Braksiek treated plaintiff for his pilonidal wound, found it was not infected, and referred him to the wound center. (Doc. 63-3, at 43). Dr. Braksiek noted that "[o]n the outside, [plaintiff] was on methadone and when we attempted to get him on that here, Dr. Zahn-Houser, who is in charge of the methadone distribution process declined to have him continue, which was her decision." (*Id.*). Dr. Braksiek concluded that narcotic pain killers were not indicated for plaintiff's pain from his wound. (*Id.*). Other than the wound, Dr. Braksiek noted the examination

was "unremarkable"; there were no notations that plaintiff was suffering withdrawal symptoms. (*Id.*).

On March 2, 2022, plaintiff's open wound on his buttock was treated again. (Doc. 63-3, at 72).

On March 8, 2022, plaintiff sent a message by sick call again claiming Ehrisman lied and threatening to sue for deliberate indifference to medical needs. (Doc. 63-3, at 25).

On March 9, 2022, Ehrisman called CRTC and spoke with "Jenna" about plaintiff stating that CRTC wanted to restart plaintiff on Suboxone. (Doc. 63-3, at 78). Jenna told Ehrisman that "Dr. Zahn Houser will not restart methadone or suboxone as [plaintiff] is incarcerated greater than 30 days and insurance won't pay." (*Id.*). The nursing note continued:

> Reviewed with Jenna previous conversation regarding [plaintiff's] arrest date and getting him his methadone. Dr. Zahn Houser was off so they couldn't get the federal exception and given that he would have been off more than 5 days she wouldn't restart. She will review all of this with Dr. Zahn Houser and send a letter regarding decision.

(*Id.*).

On March 10, 2022, Ehrisman called CRTC and left Jenna a message about the status of the letter. (Doc. 63-3, at 79). Later that same day Jenna left Ehrisman a message stating that "she is working with her regional manager and Nicole to see if they can send the letter as technically [plaintiff] is no longer a patient of CRTC. She will call me back tomorrow with an update." (*Id.*).

On March 11, 2022, Jenna from CRTC called Ehrisman and reported that "after speaking with her team she will be able to send a letter stating 'he is no longer a patient at [CRTC].'" (Doc. 63-3, at 80).

9

Also on March 11, 2022, CRTC requested an updated ROI from plaintiff. (Doc. 63-3, at 81). Plaintiff refused to sign the ROI. (Doc. 63-3, at 44, 81).

On March 17, 2022, plaintiff returned from Mercy healing center and received further treatment for the wound on his buttock. (Doc. 63-3, at 83).

On March 21, 2022, Jail medical staff provided plaintiff with Tylenol and an ice pack to relieve pain for his wound. (Doc. 63-3, at 84).

On March 24, 2022, Jail medical staff provided plaintiff with additional care for his wound. (Doc. 63-3, at 87).

On April 3, 2022, plaintiff complained about not receiving his methadone and stated that if funding was the only issue with CRTC, plaintiff would pay for the methadone himself. (Doc. 63-3, at 91).

On April 4, 2022, Ehrisman spoke with the United States Marshals Service about plaintiff's condition and his desire to restart his methadone and pay for it himself. (Doc. 63-3, at 92). The Marshals Service advised against restarting plaintiff on methadone because the federal prison where plaintiff would soon be moved would take him off it. (*Id.*). The Marshals Service also noted that an inmate must have at least three days of any medication at the time of transfer and to obtain this supply could be "tricky" and lead to a delay in transferring plaintiff to the federal facility. (*Id.*).

Also on April 4, 2022, Ehrisman called CRTC and spoke with Jenna again about plaintiff's request to restart methadone and his willingness to pay for it himself. (Doc. 63-3, at 93). Ehrisman advised Jenna that the Marshals Service were working to transfer plaintiff to a federal prison within the next month or sooner. (*Id.*). Jenna stated she would talk to her "team to see if this [restarting plaintiff on methadone if he pays for it himself] is feasible to do." (*Id.*). Ehrisman also continued daily dressing changes on plaintiff's wound. (Doc. 63-3, at 94).

10

On April 7, 2022, plaintiff was seen at the Mercy healing center to follow up on his pilonidal wound. (Doc. 63-3, at 97).

On April 9, 2022, plaintiff was again treated for his wound. (Doc. 63-3, at 99).

On April 11, 2022, plaintiff was transferred out of the Jail custody. (Doc. 63-2, at 1).

Dr. Braksiek has since reviewed medical staff notes and logs and opined that the Jail medical staff promptly addressed plaintiff's complaints about specific medical needs. (Doc. 63-3, at 6). Dr. Braksiek also reviewed the treatment notes of other physicians who treated plaintiff and noted that none of them prescribed any treatment for opioid withdrawal for him. (*Id.*). Regarding Dr. Evans' discharge summary, Dr. Braksiek stated that it was a general instruction and not prescriptive. (*Id.*, at 6-7). Dr. Braksiek found it most notable that Dr. Evans did not prescribe anything to treat plaintiff's withdrawal symptoms. (*Id.*, at 7). Dr. Braksiek stated that, as an emergency room physician, he routinely encounters individuals in various stages of opiate withdrawal and, in his experience, there is a wide range of patients who present with withdrawal. (*Id.*). Not all patients need prescription medication. (*Id.*). Patients who exhibit severe physical symptoms of withdrawal require medical intervention while other patients with self-described opiate withdrawal who do not present physical symptoms of withdrawal are generally told to follow up with a substance abuse provider and are not prescribed medication. (*Id.*). In Dr. Braksiek's professional experience and opinion treating moderate symptoms of opioid withdrawals without the use of opioid derivatives has a relatively high response rate and improvement rate and is an appropriate alternative to prescriptions such as methadone and suboxone. (*Id.*). Dr. Braksiek opined that plaintiff at no time experienced an emergent or critical need for methadone, suboxone, or narcotic pain intervention while in his care at the Jail. (*Id.*). Dr. Braksiek stated that plaintiff was continually monitored and medically treated for all his conditions. (*Id.*). Dr.

Braksiek also opined that plaintiff's physical pain from withdrawal was treated appropriately and conservatively given his history of drug abuse, his tendency to hide medication, his noncompliance, and the dynamics and demands of a penal facility, and he was treated appropriately for his chronic pain due to his wound. (*Id.*). To the best of Dr. Braksiek's knowledge, there was no indication that the Jail physicians, nurses, or administration did anything to prevent plaintiff from receiving the best possible medical care. (*Id.*).

### B. *Plaintiff's Complaint and Procedural History*

On March 9, 2022, plaintiff filed a pro se complaint. (Doc. 1). He supplemented the complaint seven times. (Docs. 2-8).

On March 28, 2022, the Court conducted an initial review of his pleadings and found them deficient in several ways, and gave plaintiff 30 days to file an amended complaint. (Doc. 9). Plaintiff filed an amended complaint, along with 12 supplements. (Docs. 10, 11, 13, 15, 16, 17, 18, 21, 22, 23, 25, 28, 29).

On August 19, 2022, the Court conducted an initial review of his amended complaint and supplements. (Doc. 30). The Court determined that plaintiff's deliberate indifference claims against Ehrisman and Shover could proceed past initial review, but dismissed plaintiff's remaining claims and all other defendants. (*Id.*).

On December 29, 2022, the Court granted plaintiff's motion for appointment of counsel. (Doc. 43).

On March 29, 2023, plaintiff, through counsel and with Court permission, filed an amended complaint.[4] (Docs. 54, 55).

---

[4] In addressing the motion for summary judgment, plaintiff's counsel noted that a reference to an open wound in plaintiff's "abdomen" was a typographical error and it should have read "buttocks." (Doc. 72-1). The Court will accept this amendment to the amended complaint to correct the typographical error.

12

On June 16, 2023, defendants filed a motion for summary judgment. (Doc. 63). After the Court granted an extension of time, on August 4, 2023, plaintiff filed a timely resistance. (Doc. 72). On August 10, 2023, defendants filed a timely reply. (Doc. 73).

## III.    APPLICABLE LAW

### A.    Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50 (citations

13

omitted), does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (citation omitted); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). At this stage, a court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). "Rather, [a] court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996). When considering a motion for summary judgment, the court "need consider only the

cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

### B.    Section 1983 Claims

Title 42, United States Code, Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . .  subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). Section 1983, however, provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Chapman v. Hous. Welfare Rts. Org.*, 441 U.S. 600, 617 (1979).  "One cannot go into court and claim a 'violation of [Section] 1983'—for [Section] 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617.  Rather, Section 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 (Section 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred.'" (citation omitted)); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (finding that "Constitution and laws" means Section 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution).  To state a claim under Section 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States and (2) the alleged deprivation of that right was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

15

### C.     Deliberate Indifference to a Serious Medical Need

Liability under Section 1983 may arise "for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker v. McCollan*, 443 U.S. 137, 146 (1979). An inadequate medical care claim is governed by the Eighth Amendment deliberate-indifference standard. *See Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

> Whether an official was deliberately indifferent requires both an objective and a subjective analysis. *Scott v. Benson*, 742 F.3d 335, 339-40 (8th Cir. 2014). Under the objective prong, [the plaintiff] must establish that he suffered from an objectively serious medical need. *See id.* at 340. To be objectively serious, a medical need must have been "diagnosed by a physician as requiring treatment" or must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Under the subjective prong, [the plaintiff] must show that an official "actually knew of but deliberately disregarded his serious medical need." *Id.* This showing requires a mental state "akin to criminal recklessness." *Id.* (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Consequently, [the plaintiff] must show "more than negligence, more even than gross negligence" to evince deliberate indifference. [*Fourte v. Faulkner Cty.*, 746 F.3d 384, 387 (8th Cir. 2014)] (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)).

*Id.* at 1065; *accord Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006).

A severe case of methadone withdrawal may constitute a serious medical need. *See, e.g., Jackson v. Blain,* No. CV 20-1932-SVW (KS), 2020 WL 7379139, at *6 (C.D. Cal. Nov. 12, 2020*); Foelker v. Outagamie Cnty.*, 394 F.3d 510, 513 (7th Cir. 2005) (finding that inmate who suffered from severe methadone withdrawal symptoms had a serious medical need).

When medical care is provided to a prisoner, malpractice in that care is not sufficient to violate the prisoner's Eighth Amendment rights. *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018). And although "inmates have a right to adequate medical care,

they have no 'right to receive a particular or requested course of treatment,'" and thus a prisoner's disagreement with a medical professional's opinions regarding the course of treatment does not violate the prisoner's constitutional rights. *Id*. at 921–22 (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

To establish an official's deliberate indifference to a serious medical need, a plaintiff must demonstrate: (1) a substantial risk of serious harm to the inmate existed and (2) the prison official knew of and disregarded that risk. *Robinson v. Hager*, 292 F.3d 560, 563-64 (8th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)); *see also Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020). As noted, to establish such a violation, plaintiff must demonstrate both an objective and subjective component. *Coleman*, 114 F.3d at 784. An imperative prerequisite to success on this claim is that the officials "knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). This showing requires a "mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Gordon*, 454 F.3d at 862. The result of that requirement is the necessary implication that negligent failure to diagnose and negligent treatment are insufficient to support a claim under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Bellecourt v. United States*, 994 F.2d 427, 431 (8th Cir. 1993); *see also Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.").

## IV. ANALYSIS

Defendants argue summary judgment is appropriate for multiple reasons: (1) plaintiff failed to exhaust administrative remedies at the penitentiary as required prior to bringing suit; (2) plaintiff failed to show defendants were deliberately indifferent to plaintiff's medical needs; and alternatively (3) defendants are entitled to qualified

immunity. (Doc. 63, at 1-2). In its reply brief, however, defendants state that their failure to exhaust argument was erroneously asserted. (Doc. 73, at 1). The Court will thus address the last two grounds defendants raise.

### A. Deliberate Indifference to a Serious Medical Need

Defendants argue they are entitled to summary judgment because they were not deliberately indifferent to plaintiff's serious medical need. (Doc. 63-1, at 7-12). Defendants argue the evidence shows plaintiff was not suffering a serious medical need because there is no evidence he was suffering a serious withdrawal from methadone. (*Id.*, at 7-9). Defendants further argue that, even if plaintiff's condition was deemed a serious medical need, there is no evidence defendants were deliberately indifferent to that need. (*Id.*, at 9-12).

Plaintiff argues that defendants denied him access to methadone treatment, causing him to go "cold turkey" and that denial constituted deliberate indifference to his serious medical needs. (Doc. 72-2, at 1-2). Plaintiff claims he was diagnosed with opioid withdrawal. (*Id.*, at 7). Plaintiff argues there is a factual dispute as to whether defendants were deliberately indifferent to his medical needs. (*Id.*, at 5-8). Plaintiff argues "the substantial risk of serious harm to [him] was symptoms of methadone withdrawal." (*Id.*, at 5). Plaintiff alleges that Ehrisman failed to make arrangements with CRTC for continuing his treatment, miscommunicated with CRTC, and lied about her communication with CRTC. (*Id.*, at 6-8). Plaintiff argues that Dr. Evans directed Ehrisman to follow up with CRTC and it is a fact question for the jury whether her failure to do so shows deliberate indifference. (*Id.*, at 8). As for defendant Shover, plaintiff asserts that correctional officers can be held liable for failing to intervene when another officer violates an inmate's constitutional rights and Shover was aware of Ehrisman's refusal to provide methadone to plaintiff and nevertheless denied plaintiff's grievance. (*Id.*).

The Court will address first whether any reasonable jury could find plaintiff suffered from a serious medical need and then, assuming so, will turn to whether a reasonable jury could find either defendant was deliberately indifferent to plaintiff's medical needs.

### 1. *Serious Medical Need*

The first question is whether plaintiff suffered a serious medical need. Plaintiff alleges that his severe methadone withdrawal constituted a serious medical need. The Court finds otherwise.

Here, plaintiff claims he did not have access to his prescribed methadone and as a result he experienced methadone withdrawal symptoms, which include frequent diarrhea, nausea, stomach cramps, vomiting, hot and cold flashes, inability to keep liquids down, rapid heart rate, sweating, severe confusion, delusions, and hallucinations, extreme pain, and sleep deprivation. (Doc. 55, at 12-13). But a complaint is not evidence. Absent from the record—that is, from the parties' statements of uncontested facts and appendices—is any evidence showing what the symptoms of methadone withdrawal actually entail. Also absent is any evidence of what constitutes a severe case of methadone withdrawal as opposed to a mild or moderate case of withdrawal.

Even assuming the symptoms of methadone withdrawal are as plaintiff alleges, there is little evidence he suffered any of them. Plaintiff claims he suffered delusions and hallucinations (Doc. 55, at 13), but in his response to defendants' motion for summary judgment he points to no place in the record showing this. Indeed, the record shows the opposite because plaintiff repeatedly denied delusions and hallucinations. (Doc. 63-3, at 48, 50, 51, 52). Plaintiff made no showing in the record, and the Court could find none, that he ever suffered nausea, inability to keep liquids down, rapid heart rate, vomiting, hot and cold flashes, sweating, severe confusion, or extreme pain related to methadone (as opposed to his pilonidal wound). Plaintiff also failed to show on the

19

record that he suffered frequent diarrhea; there is only one reference relating to plaintiff's self-report that he had diarrhea on one occasion. (Doc. 63-3, at 48). That does not show he suffered frequent diarrhea. The record also does not support a showing that plaintiff suffered stomach cramps; the only reference to cramps was to muscle cramps, and again was made on only one occasion. (*Id.*). Plaintiff did complain of poor appetite and sleep disturbance (Doc. 63-3, at 47, 48, 49), but there is nothing in the record that shows that his sleep disturbance arose from methadone withdrawal (as opposed to trying to sleep in a noisy jail), and plaintiff does not allege loss of appetite is a symptom of methadone withdrawal. The only evidence that plaintiff suffered any methadone withdrawal symptoms whatsoever is his own self-report.

Plaintiff's claim that Dr. Evans "diagnosed" him with methadone withdrawal (Doc. 72-2, at 3) is not supported by the record. That reference was in a discharge summary, not a diagnosis. (Doc. 63-3, at 7). Further, it is based on plaintiff's self-report, nothing more. There are no medical records from Dr. Evans' examination containing findings or observations of any such symptoms. Importantly, neither Dr. Evans, nor any other doctor, prescribed medication to plaintiff for opioid withdrawal.

In contrast, Dr. Braksiek averred under oath that he examined plaintiff and did not see any symptoms of opioid withdrawal. (Doc. 63-3, at 6). Plaintiff offered no medical opinion or evidence to contradict this assertion.

In short, the Court finds that plaintiff has failed to show that he suffered methadone withdrawal symptoms at all, let alone severe withdrawal symptoms that would rise to the level of a serious medical need. Although plaintiff alleges his methadone withdrawal symptoms aggravated his pilonidal wound (Doc. 72-1, at 1), there is no support for this allegation in the record whatsoever. And plaintiff is not alleging, and has not shown, that defendants failed to properly treat his pilonidal wound. To the contrary, the record shows the Jail medial staff treated him daily for the pre-existing condition and repeatedly

took him to specialists for further treatment. Thus, the Court grants defendants' motion for summary judgment because no reasonable jury could find on this record that plaintiff suffered a serious medical need.

### 2. Deliberate Indifference

Even if the Court were to find that plaintiff showed the existence of a serious medical need, the Court would find he failed to show that defendants were deliberately indifferent to that need.

Plaintiff alleged that Ehrisman deprived plaintiff of access to his methadone treatment regime, ignored CRTC attempts to contact her about plaintiff's methadone treatment, and lied about having contact with Dr. Zahn-Houser having discontinued the methadone treatment. (Doc. 55, at 13). Plaintiff further alleged that Ehrisman told another unnamed nurse that plaintiff would not be getting any methadone and that he would have to "dry out." (*Id.*). An intentional denial of methadone treatment to an inmate can constitute deliberate indifference. *See Messina v. Mazzeo*, 854 F. Supp. 116, 140-41 (E.D.N.Y. 1994) (denying motion to dismiss when plaintiff alleged nurse deliberately refused to provide methadone to inmate). But allegations are not evidence. At this stage of the litigation, in response to a motion for summary judgment, it is time for plaintiff to produce evidence to support his allegations. The evidence fails to support these allegations.

The evidence shows that Ehrisman contacted CRTC on multiple occasions and the United States Marshals in an effort to pursue obtaining methadone for plaintiff. The Court disregards plaintiff's claim that Ehrisman allegedly told some unidentified nurse that plaintiff would not get methadone and would have to "dry out." Plaintiff has failed to identify that nurse or produce any document or any other evidence to support that allegation. Indeed, plaintiff does not even raise that allegation in his brief in opposition to the motion for summary judgment.

Plaintiff alleges Ehrisman lied about the CRTC telling her that they wouldn't have a provider that could sign the federal exception until Monday and that "by then [plaintiff] will be off the medication for too many days that the Dr. won't restart him." (Doc. 72-2, at 6). Plaintiff arrives at this conclusion because the following Monday would have been only four days since plaintiff's last methadone treatment and a later letter from CRTC said that it was discharging plaintiff from the clinic because it has been more than 15 days. (*Id.*, at 6-7). There are several problems with plaintiff's argument.

First, it is based on an inference, not evidence. Though the Court must view the evidence in favor of the non-moving party, that does not mean the Court must reach inferences that are unsupported by the evidence. Plaintiff did not obtain a statement from CRTC about this communication or obtain any clarification about the apparent inconsistency. The Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that plaintiff's favor here. But plaintiff "may not rely on allegations or denials." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). Instead, he must substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Id.* (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). Here, plaintiff is relying on speculation and conjecture to assume that Ehrisman lied about what CRTC told her because there is conflicting information in the record about how many days a patient must be off methadone before a doctor will stop the prescription.

Second, it is not a given that the statements are inconsistent; not restarting a patient on methadone is not necessarily the same thing as discharging a patient from a clinic. In other words, it could be that a doctor would not continue a patient on methadone after missing four days of the drug, but still see the patient at the clinic. Declining to restart a prescription and discharging a patient from a clinic are not necessarily the same thing and the Court will not assume they are on this record.

22

Last, and most significant, plaintiff has not shown that CRTC did not, in fact, make the first statement to Ehrisman. In other words, if there is an inconsistency, it could be because whomever told Ehrisman that plaintiff would not be continued because it would be too many days was simply mistaken, or the person who wrote that it was a 15-day period was mistaken. Indeed, the record shows there is support for the assertion that a delay as short as five days may be too many to restart a patient on methadone. On March 9, 2022, Ehrisman called Jenna at CRTC, who told Ehrisman that "Dr. Zahn Houser was off so they couldn't get the federal exception and given that he would have been off more than 5 days she wouldn't restart." (Doc. 63-3, at 78). Though there may be a fact question about whether it is 4 days, 5 days, or 15 days that is too many to restart a patient on methadone, what plaintiff has not disputed with reliable evidence is that CRTC made conflicting statements to Ehrisman. Plaintiff has simply failed to show that Ehrisman made up these statements on her own.

Plaintiff argues that Ehrisman has admitted in her affidavit that there was miscommunication between her and CRTC, and that it should be up to the jury to determine if that was her fault. (Doc. 72-2, at 4, 7). That is inaccurate. What Ehrisman stated was: "It is possible that there may have been a miscommunication on either one of our ends. If I made any errors or contributed to any miscommunication it was entirely unintentional." (Doc. 63-3, at 11). Regardless, miscommunication does not show that Ehrisman was deliberately indifferent to plaintiff's medical needs. As previously noted, negligence does not constitute a claim of deliberate indifference. *Estelle*, 429 U.S. at 105-06. Rather, the "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995); *see also Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002) ("At best, [the plaintiff's] allegations state a difference in opinion between himself and his doctors or

23

allege a mistake in classification or treatment. Neither differences of opinion nor medical malpractice state an actionable Constitutional violation."). Even if there was miscommunication, and even if Ehrisman was the source of this miscommunication, that is, at most, negligence. Thus, the acts and omissions by Ehrisman amounts to no more than negligence, if even that. Plaintiff has failed to adequately provide evidence establishing the subjective prong—that Ehrisman was deliberately indifferent to and disregarded a serious risk to plaintiff's health.

In short, the Court finds that plaintiff has failed to come forward with any evidence from which a reasonable jury could conclude that Ehrisman was deliberately indifferent to plaintiff's serious medical needs.

Plaintiff's case against defendant Shover is even weaker. Plaintiff asserts that Shover is responsible for responding to inmate grievances and that Shover reviewed plaintiff's grievance but "incorrectly represented that CRTC had already cancelled Plaintiff's medical treatment." (Doc. 55, at 14). Plaintiff alleges this shows that "Shover was aware of the denial of medical care to Plaintiff yet failed to intervene to assure that Plaintiff was provided adequate medical care." (*Id.*). Again, though, allegations are not evidence.

Under Section 1983, a correctional officer can be held liable for failing to intervene in another officer's constitutional violation. *See Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981) (determining that a deputy could be held "jointly liable for failing to intervene if a fellow officer . . . was using excessive force and otherwise was unlawfully punishing the prisoner.").

Here, plaintiff's evidence is lacking. First, there is no showing that Shover had the authority to direct Ehrisman to provide methadone to plaintiff. Second, there is no evidence that Shover knew enough about methadone and withdrawal symptoms to be aware that it presented a serious medical need. Third, the record shows that Shover was

relying on the Jail's medical records which did, indeed, state that the doctor would not further prescribe methadone because too many days had passed. Even if that was an erroneous statement or the product of miscommunication—indeed, even if it was a false statement by Ehrisman—Shover had no reason or basis to believe that statement was erroneous. In short, there is absolutely no evidence in the record to support any claim against Shover.

Given the undisputed evidence, even viewed in the light most favorable to plaintiff, the Court finds that a reasonable jury could not conclude that defendants were deliberately indifferent to plaintiff's serious medical needs. Thus, defendants are entitled to summary judgment on this ground.

### B.    *Qualified Immunity*

Defendants argue they are entitled to qualified immunity because their conduct was objectively reasonable in light of the legal rules that were clearly established at the time. (Doc. 63-1, at 12-14). Plaintiff disagrees. (Doc. 72-2, at 8-10). Because defendants raised qualified immunity at the summary judgment stage, plaintiff must produce evidence to create a genuine issue of fact regarding whether defendants violated "clearly established" law. *Johnson v. Fankell*, 520 U.S. 911, 915 (1997). Plaintiff has not done so here. To show this, plaintiff must identify "either controlling authority or a robust consensus of cases of persuasive authority that placed the statutory or constitutional question beyond debate at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (internal quotation marks and citation omitted).

"The defense of qualified immunity gives government officials engaged in discretionary activities immunity from liability unless their conduct violates clearly established statutory or constitutional rights." *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal quotation marks and citation omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they

25

exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects government officials from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citation omitted).

Put another way, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotations and citation omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (citation omitted). The Court uses a two-part test to determine whether a government official is entitled to qualified immunity. *See Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014). The Court must decide (1) whether the facts when viewed in a light most favorable to the plaintiff demonstrate the defendant deprived plaintiff of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the deprivation. *Id.* "If the answer to either question is no, then [a defendant] is entitled to qualified immunity." *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted). In other words, "there does not have to be a previous case with exactly the same factual issues." *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009) (citation omitted). But the implicated right cannot be defined "at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

Here, the Court found there was no genuine issue of material fact that would permit a reasonable jury to find that defendants were deliberately indifferent to plaintiff's serious medical needs. There is no clearly established law that would, on this record,

have made defendants aware that they were violating plaintiff's constitutional rights in the way they provided him medical care. Accordingly, even if the Court were to have found that defendants violated plaintiff's constitutional rights, the Court would alternatively grant defendants qualified immunity because the law did not clearly establish that their conduct was unconstitutional.

Thus, the Court grants defendants' motion for summary judgment on this ground.

## V.    CONCLUSION

For these reasons, the Court **grants** defendants' motion for summary judgment. (Doc. 63). The Clerk of Court is directed to **enter judgment** in favor of defendants and against plaintiff. This case is **dismissed with prejudice**.

**IT IS SO ORDERED** this 30th day of August, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

27